Stinson School of Aviation, Inc. v. Commissioner.
Stinson Sch. of Aviation, Inc. v. Commissioner
Docket No. 6105.
United States Tax Court
1945 Tax Ct. Memo LEXIS 35; 4 T.C.M. (CCH) 1028; T.C.M. (RIA) 45347; November 21, 1945
*35 James G. Mitchell, Esq., 405 Lexington Ave., New York 17, N. Y., for the petitioner. William Schwerdtfeger, Esq., and Henry C. Clark, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioner's income, excess-profits and declared value excess-profits taxes for the calendar years 1940 and 1941, as follows: 1940
Income taxes
$2,048.67
1940
Excess-profits taxes
1,580.63
1940
Declared value excess-profits taxes
1,773.26
1941
Income taxes
1,492.93
1941
Excess-profits taxes
545.52
1941
Declared value excess-profits taxes
624.85
He also determined delinquency penalties for failure to file excess-profits tax returns in the amounts of $395.16 for 1940 and $136.38 for 1941. The deficiencies result from respondent's disallowance of an interest deduction taken by petitioner in 1940, and of parts of the deductions taken by petitioner in both 1940 and 1941 on account of salaries paid by petitioner to its president and secretary. Respondent, on brief, concedes error in disallowing the deduction taken on account of interest. Therefore the primary issue now before us concerns *36 the reasonableness of salaries paid by petitioner to two officers. If our decision on this issue is for respondent, then we must also determine whether petitioner is liable for the delinquency penalties above referred to. Findings of Fact Petitioner is a corporation organized on October 1, 1938, under the laws of the State of New York, with its principal place of business in New York City. It filed its income and declared value excess-profits tax returns for the years 1940 and 1941 with the collector of internal revenue for the first district of New York. It filed no excess-profits tax returns. It was dissolved in January of 1944. Petitioner was engaged in the business of operating a private school for the training of aviation mechanics. Its officers were Jack B. Stinson, president; David E. Towle, vice-president; and Naomi A. Martin, secretary-treasurer. These individuals also constituted the Board of Directors. Petitioner developed from and took over the operations of a similar business operated by Stinson with Miss Martin's help prior to the incorporation. This business had its inception in 1934 with a series of radio broadcasts which expressed certain phases of aviation *37 and airplane construction. Miss Martin worked with Stinson in the preparation of these broadcasts. On September 11, 1935, Stinson leased space for use in the conduct of a school for aviation mechanics and the school continued thereafter until the date of incorporation, Stinson from time to time executing other leases in his individual capacity. Stinson was the legal owner of the predecessor business and he filed a certificate of doing business in the name of Stinson School of Aviation. Although ownership of the school was in Stinson's name, he believed that the assets morally belonged to Miss Martin, since she had furnished all of the original capital, and had served part time but substantially for two years not only without compensation, but continuing to furnish operating funds out of her salary from other employment and for the later two years full time, withdrawing only enough money for her living expenses. The physical assets of the school, at the time of the incorporation, were valued at $5,800, and the cash on hand amounted to $3,262. The minutes of the meeting of the Board of Directors at the time of the incorporation of petitioner, recited that Miss Martin transferred such *38 property, there listed in itemized form, and the cash, to the corporation, in exchange for the issuance to her of 197 shares of the 200 shares of its authorized capital stock, and she paid $138 for the three remaining shares, so that all of the authorized stock was thereupon issued to her on October 5, 1938, and she continued to hold it throughout the life of the corporation. This was in conformity with Stinson's conviction that the, assets of the school morally belonged to Miss Martin, and the issuance of petitioner's stock to her was with Stinson's knowledge and consent. Petitioner reported a gross income of $71,297.03 for 1939 and a net loss for that year of $230.38. For 1940 it reported a gross income of $103,103.18, and a net income of $2,044.94. For 1941 it reported a gross income of $90,681.11 and a net loss of $943.88. Petitioner has never declared a dividend. The amount of salary originally authorized by petitioner's board of directors for 1939 was $10,000 for Stinson and $9,000 for Miss Martin. On November 15, 1939 the board passed two resolutions one of which reads as follows: "RESOLVED that the financial condition of the Stinson School of Aviation, Inc., at the closing *39 of the books at the end of the third quarter of the fiscal year of 1939 did not warrant the original salary set forth for Mr. Jack B. Stinson as President and Director of the Stinson School of Aviation, Inc. and the financial condition of the business makes it necessary to lower said salary to Nine Thousand Dollars ($9,000) for the fiscal year of 1939. (Mr. Jack B. Stinson qcquiesced to such change.)" The second resolution is in almost identical language and reduces Miss Martin's salary to $8,400 with her consent. Stinson and Miss Martin were the only directors present when these resolutions were passed. The salaries paid were in these reduced amounts. The board of directors on May 5, 1940, authorized salaries of $16,000 for Stinson in 1940 and $15,600 for Miss Martin. These two individuals were the only directors present. The salaries paid were $15,900 and $15,540, respectively. The Board of directors on April 7, 1941 authorized salaries of $16,000 for Stinson in 1941 and $15,600 for Miss Martin. They were the only directors, present. On November 5, 1941 the board passed two resolutions one of which reads as follows: "RESOLVED that the financial condition of the Stinson Wchool *40 of Aviation, Inc. at the closing of the books at the end of the third quarter of the fiscal year 1941 make [mode] it necessary to lower the original salary of $16,000.00 set for Mr. Jack B. Stinson as President and Director to Thirteen Thousand Four Hundred Dollars ($13,400) for the fiscal year 1941." The second resolution is in almost identical language and reduces Miss Martin's salary to $13,040. Stinson and Miss Martin were the only directors present. The salaries paid were in these reduced amounts. During the years 1940 and 1941 Stinson's salary was partially paid at the rate of $200 per month and Miss Martin's at the rate of $170 per month. The remainder of the salaries for 1940 was paid by checks to Stinson and Miss Martin each in the sum of $13,500 and each dated November 29, 1940. The remainder of the salaries for 1941 was paid by checks to Stinson and Miss Martin each in the sum of $11,000, and each dated November 28, 1941. Stinson had been an aviation enthusiast since 1914, when his mother operated a ying school in Texas. He was fourteen years old and in high school when he began working during his spare time at the school. He was employed by the government in 1918 *41 and 1919 at the Dayton-Wright Co., in Dayton, Ohio. He then undertook to establish a business of his own in Dayton, the Stinson Airplane Co., but he was unable to continue this through the post-war depression of 1921, due to lack of market for his product. After a short period of "barnstorming" he was engaged by the LWF Engineering Corporation in charge of wing designing and as a consultant on a project which that company had undertaken for the government to develop mail planes. From 1924 to 1926, Stinson did some free lancing as a consultative industrial expert, and later he became associated with the Charles E. Bedaux Co. as an industrial engineer, advising en manufacturing methods and procedures. He then went into business with his brother in Detroit in the Stinson Aircraft Corporation engaged in the manufacture of airplanes. Then, in 1927, he organized the "Stinson School of Aviation" in Detroit, a sole proprietorship. He began this without much capital and became quite successful before the economic crisis of 1929. He earned between $20,000 and $30,000 in 1928. This venture was discontinued in 1929, and Stinson went to work for the Sikorsky Aviation Corporation. Then he became *42 director of training of the American Aviation School in New York City. About 1934 he was employed part time by the Board of Education in New York City as an instructor in aviation in the schools of New York. During that time, he began to plan the establishment of another school, and arranged for the radio program to which reference has been made, for which he and Miss Martin received no compensation. They were designed as valuable publicity looking toward the establishment of the school. Stinson's earnings during all these years fluctuated widely from a few hundred dollars in some years to the $20,000 to $30,000 realized from the operation of his Detroit School. In the operation of petitioner, Stinson originated all the material used in aviation theory designed to enable the students to pass any required written examination for mechanic's licenses, and manual instruction to train them to be competent mechanics. He trained and supervised the instructors and personallh supervised the instructors and personally supervised the preparation of the students for their C.A.A. examinations. He designed equipment for use in the school. and designed modification of the equipment which was *43 purchased. He handled all the executive functions and initiated the policies to a large extent. During the earlier years, he also went out to interview possible and prospective employers of his gra nduates, and kept in touch with their later progress and experiences. Miss Martin was graduated from State Teacher's College at Emporia, Kansas, in 1926, with the degree of Bachelor of Science, in education. Prior to her graduation, she worked part time as cashier, stenographer, assistant to a dramatic's and dancing teacher, and as assistant to the manager of a feed and grain business. After graduation she taught commercial subjects in various high schools, organized dramatic groups, served as a secretary to a member of Congress in Washington, and later, became associated with private schools in New York. Her experience included organizing and setting up curricula, and training instructors, as well as teaching. In New York she became associated with Stinson in the preparation of the radio programs which were the forerunner of the school. From the first, Miss Martin contributed more or less continuously small sums of money with which to defray the expenses of the school, and to buy the *44 equipment essential to its operation. No record was kept of the total amount of her contributions, but they constituted virtually all of the original capital of the enterprise. For a time, when they operated evening classes only, Miss Martin worked elsewhere during the day, and contributed portions of her salary to defray the running expenses of the school. When it developed to the point of operating as a fulltime day school, Miss Martin devoted her full time to its affairs. She served as registrar, conferred with students and parents, handled all enrollments, planned the curriculum, edited the material used as text books, handled the financial transactions, and prepared examinations. In addition, she conferred with State and Federal government inspectors and officials, gave all intelligence and aptitude tests to the students, supervised the office personnel, made several trips to inspect all the approved aviation schools in the Middle Western and Eastern sections of the country, visited airplane factories, and kept in touch with the Civil Aeronautics Authority in order to be fully familiar with their regulations and requirements. Both Stinson and Miss Martin worked extremely long *45 hours and sometimes on Sundays. They often worked sixty to seventy hours a week. During the two years involved here, more than 1,200 students were trained in the school. Petitioner employed three girls who worked in the office, twelve to fifteen instructors, two or three maintenance men and two stock room men. It had an average monthly attendance of students ranging from 207 to 300 during 1940 and from 205 to 295 during 1941. The vice president, Mr. Towle, whose compensation is not questioned here, solicited students for the school, and his compensation was based on the number of students he secured. In 1940 he received approximately $15,000. Respondent disallowed the deduction of $6,900 of the $15,900 paid Stinson in 1940, and $4,400 of the $13,400 paid him in 1941, allowing $9,000 for each year. He further disallowed $7,140 of the $15,540 paid Miss Martin in 1940, and $4,640 of the $13,040 paid in 1941, allowing $8,400 for each year. Respondent assessed a penalty against petitioner for failure to file an excess-profits tax return. If the salaries here in question were properly deducted by petitioner, it was not liable for excess-profits taxes for the years 1940 and 1941. *46 The salaries paid by petitioner to its president and to its secretary-treasurer in the years 1940 and 1941 were reasonable and constituted compensation for personal services actually rendered. Opinion KERN, Judge: The respondent suspects that Stinson was the owner of one-half of the capital stock of petitioner, and that the amounts paid to him and Miss Martin represented dividends in disguise. Unfortunately for that contention, all the evidence in the record opposes it. Stinson testified unequivocally that, although the property used in the operation of the school prior to its incorporation was held in his name, he considered Miss Martin to be the real owner since she had furnished all the initial capital, and had worked entirely without compensation during the initial years, and for her bare living expenses for several years thereafter. For that reason, on the occasion of the incorporation of petitioner, its stock was issued to Miss Martin. We can find no substance in the evidence to nourish a conclusion that Stinson owned any part of the stock, or that he caused it to be issued in Miss Martin's name to avoid subjecting it to his personal obligations. We therefore conclude from *47 the evidence that all the stock belonged to Miss Martin and that the salaries paid bore no relation or connection with the stock ownership, and could not, therefore, have been dividends. The question whether the compensation so paid was reasonable in amount is a question of fact as to which the respondent's determination carries a presumption of correctness. Respondent does not deny that substantial and valuable services were actually rendered by the individuals in question. However, respondent in support of his determination cites the smallness of the corporation, the fact that Miss Martin's earnings in earlier years had not approached the amount of the salary paid her by petitioner, and that Stinson's earnings had fluctuated widely during his career, and the fact that the salaries in question constituted 30 percent and 29 percent in 1940 and 1941, respectively, of the gross income of petitioner; and the fact that no dividends were paid. We have considered all these circumstances. We are not greatly troubled by the fact that both Stinson and Miss Martin experienced a period of low earnings from 1929 until 1935 or 1936. We think it somewhat more significant than respondent recognizes *48 that Stinson, in an earlier year, had earned for himself between twenty and thirty thousand dollars in a venture of almost the identical nature as the one involved here. The outstanding fact in this case is that petitioner was a personal service corporation. Only an insignificant part in the creation of its income can be ascribed to invested capital. Its success was achieved and its income was earned largely through the services of Stinson and Miss Martin. Their prodigious efforts during the first several years of the school's development had gone largely unrewarded. Their purpose then was not the realization of immediate profit, but the building of future financial security and the establishment of a school which conformed to their ambitions and hopes. As the school found a solid footing and began to prosper, they determined and authorized in proper formal proceedings, as directors, the payment of what they felt to be fair and adequate salaries, in view of the quantity and quality of their work and responsibilities, and the results accomplished. The fact that no dividends were paid is not particularly significant where the salaries paid to officers bore no relation to stockholdings. *49 Respondent relies heavily upon the failure of petitioner to prove what like enterprise would ordinarily pay for services similar to those of Stinson and Miss Martin under like circumstances. Such evidence would have been pertinent and helpful but it is only one of the factors to be considered in deciding the issue. We do have in the record two facts which may be considered for comparative purposes: (1) Petitioner's vice-president received as compensation for his services in 1940 the sum of approximately $15,000 and respondent does not question the reasonableness of this compensation; and (2) as we have already mentioned Stinson received from a similar venture in a prior year between $20,000 and $30,000. Using these facts as comparatives, the salaries of Stinson and Miss Martin would appear to be reasonable. We think the petitioner has offered sufficient evidence to show the reasonableness of the salaries paid by it under the peculiar circumstances shown to have existed. Petitioner was not therefore liable for excess-profits tax and respondent erred in assessing a penalty for failure to file that return. Respondent has conceded error with respect to the interest deduction previously *50 disallowed. Decision will be entered for the petitioner.